FILED
2026 Oct-30 PM 06:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED
SEP 17 2026
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

# UNITED STATES DISTRICT COURT

for the

Northern District of Alabama

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

ELECTRONIC DEVICES SEIZED DURING INVESTIGATION OF LEVI BELCHER, ANTHONY SLOTA, AND TADASHI EREKSON

Case No. 5:26-mj-1183-HNJ

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Northern District of Alabama, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 26 U.S.C. § 5861(d) | Possession of Unregistered National Firearms Act Weapon |
| 18 U.S.C. § 875(c) | Threatening Communications |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See attached Affidavit.

5:26-mj-01178-HNJ
10/6/26 Hearing
GOVT EXHIBIT NO. 1

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

C. HLuzek
*Applicant's signature*

Chris Hluzek, FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 09/17/2026

Herman N. Johnson, Jr. Digitally signed by Herman N. Johnson, Jr. Date: 2026.09.17 16:02:49 -05'00'
*Judge's signature*

City and state: Huntsville, AL

Herman N. Johnson, Jr., U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES SEIZED DURING INVESTIGATION OF LEVI BELCHER, ANTHONY SLOTA, AND TADASHI EREKSON | Case No. 5:26-mj-1183-HNJ<br><br>Filed Under Seal |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Chris Hluzek, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Rule 41 of the *Federal Rules of Criminal Procedure* for the following electronic devices:

- Gray Apple iPhone belonging to Tadashi Ryan Erekson;
- Samsung Galaxy S21 belonging to Levi Clifton Belcher;
- Nokia G100 belonging to Anthony Elijah Slota;
- Wiko cell phone;
- Motorola M390A cell phone;
- Western Digital hard drive;
- A USB thumb drive;
- HP laptop (serial number: 5CD3025QVW);
- Seagate hard drive;
- WD Blue hard drive;
- 3D printer memory card;
- MacBook Air A1465; and
- MacBook Pro A1278,

(collectively, the "SUBJECT DEVICES"), currently in the possession of the Huntsville Police Department at the North Alabama Multi-Agency Crime Center in Huntsville, Alabama.

2. Since April 11, 2021, I have been a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code.

3. I am currently assigned to Birmingham, Alabama, FBI Field Office and serve on the Domestic Terrorism Squad, which investigates violent crimes and terroristic threats in the Northern District of Alabama. I have received training in counterterrorism, physical surveillance, confidential source management, electronic surveillance techniques, and other matters. I have conducted and/ or participated in counterterrorism investigations and investigations regarding firearms, violent extremists, and organized criminal activity.

4. Prior to the FBI, I was employed for more than twenty-four years as a law enforcement officer in the state of Alabama, where I conducted investigations and obtained and executed both search and arrest warrants and have received advanced training regarding obtaining search and arrest warrants related to major cases.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of the SUBJECT OFFENSES set forth below have occurred. There is also probable cause to believe that evidence, instrumentalities, and fruits of such violations, as described in Attachment B, will be found on the SUBJECT DEVICES.

## THE SUBJECT OFFENSES

7. **Possession of Unregistered National Firearms Act Weapon**: It is a federal crime to "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Under the National Firearms Act, a "firearm" includes:

> a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18 , United States Code); and (8) a destructive device.

26 U.S.C. § 5845(a). A silencer is defined as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of

parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(25). A "destructive device" includes:

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f).

8. **Threatening Communications:** It is a federal crime to "transmit in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C. § 875(c).

9. **Conspiracy**: It is a federal crime for "two or more persons [to] conspire either to commit any offense against the United States." 18 U.S.C. § 371.

## SUMMARY OF INVESTIGATION

10. The Federal Bureau of Investigation, Bureau of Alcohol, Tobacco (ATF), and Firearms, and Homeland Security Investigations (HSI) are investigating Levi

Clifton Belcher, Anthony Elijah Slota, and Tadashi Ryan Erekson, and other potential co-conspirators, for violations of federal firearm and explosives laws.[1]

11. As set forth below, Belcher, Slota, and Erekson appear to harbor Anti-Government or Anti-Authority Violent Extremist (AGAAVE) sentiments. For background, the AGAAVE threat encompasses the potentially unlawful use or threat of force or violence, in furtherance of political and/or social agendas, which are deemed to derive from antigovernment or anti-authority sentiment, including opposition to perceived economic, social, or racial hierarchies, or perceived government overreach, negligence, or illegitimacy. This threat category typically includes threats from anarchist violent extremists (AVEs), militia violent extremists (MVEs), and other antigovernment or anti-authority violent extremists (AGAAVE-Other).

***Belcher's Previous Law Enforcement Contact***

12. In November 2023, the ATF Nashville CGIC was informed that a concerned citizen went to the Cullman County (Alabama) Sheriff's Office to report a juvenile family member. At the time, 16-year-old Belcher (who is now an adult) was committed for a psychological evaluation but was released. According to the family member, Belcher resided in Old Hickory, TN, and had conducted numerous open-

[1] Belcher and Slota are both biological males who identify as female. Belcher uses the name "Cici" and Slota uses the name "Violet." For this affidavit, I will refer to these individuals by their legal last names.

source internet searches related to "improvised devices" and the Anarchist Cookbook.[2] This tip led to a search conducted by Metro Nashville Police Department (MNPD) and interviews by ATF Nashville Agents. According to the MNPD incident report, "no weapons or explosive items were located" during the search of Belcher's room, but "there were documents related to building an explosive device." In addition, while "there were no specific targets located on [the] computer or room," the report notes that Belcher "appears . . . interested in infrastructure locations such as power substations." Due to Belcher's juvenile status, only limited action could be taken.

13. In January 2026, Belcher's father told law enforcement that Belcher had run away from home in April 2025 and was believed to be living in Huntsville, Alabama. Employment records from the state of Alabama show Belcher earned wages beginning in the second quarter of 2025 and continuing through the end of the year. Belcher was arrested in Alabama by Madison County Sheriff's Office (MCSO) in April 2025 for unauthorized use of a vehicle without consent for taking his father's vehicle when he ran away.

***Belcher's Threatening Communications and Social Media Posts***

14. On December 18, 2025, the FBI's National Threat Operations Center received a call from Witness 1 who wanted to report a threat made online via the social

---

[2] The Anarchist Cookbook is an instruction guide on creating telecommunications networks, weapons, and homemade explosives.

media platform Threads, which is tied to the social media platform Instagram. Threads has a mobile application which can be used through a cell phone. Witness 1 resided in Oklahoma. Earlier on December 18, 2025, Witness 1 was engaged in online discussions with other accounts regarding U.S. Immigration and Customs Enforcement, also known as ICE. Threads user @c_sk9s replied to Witness 1 and said: "Don't care and also didn't ask. Id gun down an ice agent on sight".

15. When Witness 1 called @c_sk9s a "keyboard warrior", @c_sk9s replied with an image of what appears to be a loaded AR style rifle with the bolt open and a round visible in the chamber. When Witness 1 implied the rifle image was pulled from the internet, @c_sk9s replied with another image of what appears to be the same rifle with a piece of paper tucked between the magazine and magazine well. The piece of paper appeared to be a handwritten note of Witness 1's username.

16. On January 9, 2026, a Threads user posted, "Might I suggest they should also drop the nfa all together, because smaller and quieter might be more to their liking." @c_sk9s responded the next day, "That's what ive been saying. Fuck $200 and paperwork, why cant i have a suppressor and a 10 inch barrel right now man... smh."

17. On January 10, 2026, a Threads user posted, "Gross. I'm hoping they remain easy to conquer when the boogaloo[3] kicks off you know?" @c_sk9s responded, "This left has a .223 with your name on it bucko. The fourth reich will not prevail."

18. On February 11, 2026, a Threads user posted, "next time also transition your rights please." @c_sk9s responded, "Rights are for the weak. If its afforded to you by an authority structure it isnt a right. Break the law."

19. In May of 2026, Belcher posted online twice showing him in possession of firearms, including a rifle and a handgun he wore in his waistband.

20. On June 3, 2026, Belcher posted an image on Instagram and Threads referring to ICE. Belcher's post implied that he was monitoring ICE officers in a vehicle on University, a road in Huntsville, Alabama. The post referred to ICE as "pigs" with the hashtags "#migrawatch" and "#fuckice".

21. On June 16, 2026, a Threads user posted, "I'm one of the last people to fight back, especially when dealing with guns and violence. Can some of us focus on dialogues and bridge-building initiatives instead? I'd love to focus on narrowing the

[3] Some domestic violent extremists (DVEs) use the "boogaloo" concept to reference a violent uprising or impending civil war. The concept has resonated with militia violent extremists, who have adopted it to reference an impending politically-motivated civil war or uprising against the government following perceived incursions on Constitutional rights—including the Second Amendment—or other perceived government overreach. Some racially or ethnically motivated violent extremists (RMVEs) have used the term to reference an impending race war—or other conflict that will lead to the collapse of the "system," including the US government, society, etc. DVEs may allude to the boogaloo concept by using shorthand terms such as "big igloo" or "big luau" and imagery such as igloos or Hawaiian shirts. The boogaloo is not a single cohesive group, but rather a loose concept arising from internet platforms which has become a rallying point for some violent extremists.

gaps of homelessness, mass transit, and more." @c_sk9s responded, "This doesnt work. They will kill you anyways."

22. Subscriber information for the @c_sk9s account listed the registered email address that contained "belcher" and a phone number ending in x4885. The display name was "Cici." The phone number ending in x4885 was in historical FBI records as belonging to Levi Belcher of Mount Juliet, Tennessee. Belcher was born in November 2007 and turned 18 years old as of November 2025.

***Traffic Stop involving Belcher and Slota***

23. On September 10, 2026, ATF agents and Intelligence Research Specialists were able to locate a potential current location for Belcher's vehicle and set up surveillance on the vehicle located in Decatur, Alabama. During that surveillance, a vehicle was observed dropping off two individuals. These two individuals, later identified as Belcher and Anthony Slota, were observed by agents to be wearing rifle magazine carriers and had rifles slung on their bodies and handguns stored in holsters. They were also in possession of multiple military style backpacks. A third party was also observed.

24. Belcher and Slota were then observed entering Belcher's vehicle and began traveling eastbound towards the city of Huntsville. ATF Agents coordinated with the Huntsville Police Department to conduct a traffic stop on the vehicle upon its entry into the city limits. Officers observed the vehicle fail to signal while making a lane change and initiated a stop.

25. Officers encountered Belcher and Slota in the vehicle. They were armed with rifles and two 3D printed pistols. During the subsequent probable cause search, officers and agents located dozens of rifle and pistol magazines with various writings on them to include "I hate the police", "Are we free yet", and other anti-government sentiments. Hundreds of rounds of ammunition of various calibers were also located in the vehicle. Belcher and Slota were arrested.

26. Belcher had a notebook on his person. It contained the message shown below.




27. Belcher was in possession of a Samsung Galaxy S21 cell phone. Slota was in possession of a NokiaG100 cell phone. These devices are now in law enforcement custody.

### *Search of Huntsville Residence*

28. A short time later, the Huntsville Police Department Anti-Crime Unit applied for and were granted authority to search the residence where it was believed Belcher and Slota were residing. The residence belonged to an individual later identified as Tadashi Erekson. Investigators had learned that Erekson had been allowing Belcher and Slota to live there for the past several months and that Erekson also shared extreme contempt towards law enforcement. During the execution of the search warrant, Erekson was taken into custody after attempting to reach for a concealed pistol on his ankle while being detained. He was in possession of a gray Apple iPhone.

29. The residence had several unusual features. The front door did not have a door handle. Instead, it had two deadbolt locks. On the back side of the door, it was reinforced. Inside, investigators found what appears to be contingency planning for emergency events. These instructions reference "trigger events", body armor, individual first aid kits (IFAK), and plans to fortify positions inside the residence. They also referenced "SHTFEW". I believe that "SHTFEW" is an acronym for "shit hits the fan everywhere."







30. Throughout the residence, investigators observed anti-law enforcement messages and other writings advocating violence. These messages included "Hang the Libs, Hang the Nazis," "Nobody knows I have a 3D printed pistol and I fucking hate cops," "kill a cop, save a life," and "the crimes and injustice of this admin on its people can only be purged with blood", among others. Investigators also found magazines with messages stenciled on them, including "I hate the police" and "no union with fascists." Images of the messages are included below. Some of the USPS labels seen below are marked with "PSR" and a circle with a capital letter A inside. PSR is commonly referred to by anti-fascist groups and historically stood for Revolutionary Socialist Party. The emblem of a circle with a capital letter A inside is commonly known as the anarchy symbol. Based on my training and experience, I know that members of AGAAVE organizations and other similar groups often communicate and organize through the internet. These communications may be relevant to determining the intent of members

who are attempting to possess weapons that would be registerable under the National Firearms Act.






31. Hanging on a wall of the den area, which was being used as a bedroom, investigators found a short-barreled shotgun (Make: Remington Arms, Model: Sportsman 12 Pump, Caliber: 12-gauge, Serial #W063448M). ATF Agents measured the barrel length and determined it to be between 16.5 inches and 16.75 inches). The shotgun appears to have a 3D-printed purple forend. Next to the firearm was a "Remember your boots kill Nazis" message.




32. A 3D printing setup was in the den area as well. Throughout the residence were printed firearm components, including what appeared to be 3D printed items that

resembled firearm silencers.[4] In addition, investigators found 3D-printed grenade housings. The table where the 3D-printed grenades housings were found had "THEY CAN'T KILL US ALL" written on it. On the table were also what appeared to be design sketches of indeterminate items. Images of these items are included below.








[4] The items have not been tested yet to determine whether they functioned effectively.

33. Based on my training and experience, I know that a 3D printer is used in connection with a computer. 3D printers use design files, which can be contained on electronic storage mediums. I also know that these design files are available on the internet, and that it is common for people with a 3D printer to search for and use these design files. Research on design files could occur through a cell phone with internet access or a traditional computer. Design files and other materials can also be stored on the hard drive and other storage devices found in the residence. I also know that many 3D printers utilize an SD card for transferring and storing design files. The 3D printer found in the residence had an SD card in it. The card's serial number was TX008U6TSMM

34. In what was later determined to be Erekson's room in the residence, investigators found a barricade constructed of cases of water bottles (which Erekson later said were meant to be a ballistic shield and disrupt thermal imaging), skateboards, and other items. Investigators also found a short-barreled rifle in the room.






35. Based on my training and experience, I know that both the short-barreled shotgun and short-barreled rifle are required to be registered in the National Firearms Registration and Transfer Record (NFRTR).

36. The FBI conferred and discussed this matter with ATF. ATF searched the NFRTR for relevant records. The search revealed no record for the short-barreled shotgun bearing serial number W063448M. The short-barreled rifle possessed by Erekson did not have a serial number inscribed on the lower receiver. A search for Erekson in the NFRTR did not reveal any registered items. In fact, the ATF search of the NFRTR revealed no records associated with Erekson, Belcher, or Slota. Thus, Erekson, Belcher, or Slota do not have any items registered in the NFRTR.

37. The following electronic devices were found in the residence and seized pursuant to the aforementioned search warrant:

- Wik cell phone;
- Motorola M390A cell phone;
- Western digital hard drive;
- A USB thumb drive;
- HP laptop (serial number: 5CD3025QVW);
- Seagate hard drive;

- WD Blue hard drive;
- 3D printer memory card;
- MacBook Air A1465; and
- MacBook Pro A1278.

These devices, along with the cell phones described above, were taken by the Huntsville Police Department to the North Alabama Multi-Agency Crime Center, where they remain in law enforcement custody.

***Subject Interviews***

38. After they were arrested, Slota, Belcher, and Erekson were interviewed by law enforcement. Each were advised of their *Miranda* rights.

39. Slota described the group as "friends who think that we should take precautions in case of like a riot happens" and that they were "just being prepared." Slota self-identified as a "gunsmith." When asked about what appeared to be a 3D-printed suppressor found in the residence, Slota said that "it doesn't work" and "there's so much other stuff that need to be done."

40. When asked about the note that was found on Belcher's person, Slota explained that they were handing out food to the homeless where there was a sign that said no unlicensed volunteers. Slota said an undercover police officer was watching them and that the note was just to have "in case something happens." Slota explained that the group was concerned that HPD was kidnapping the homeless by arresting them for minor offenses and so the group engaged in observing police officers, which Slota labeled "cop watching." When asked if Slota had encountered anyone who might "take

it to that next level," Slota said no, and that most people in Huntsville are "very liberal" and "comfortable."

41. Slota claimed ownership of the shotgun found in the residence and said that "we" had decided to modify it when they heard the NFA was overturned. Slota also claimed ownership of the 3D printer. When asked what firearms belonged to Belcher, Slota said that Belcher "borrows all of my firearms when we go shooting."

42. Slota said there were a series of books in the residence written by Ragnar Benson that "might raise an eyebrow." Slota mentioned that some of Ragnar Benson's books concerned manufacturing C4 explosives, but that Slota was "not smart enough to make that."[5]

43. Slota also identified the 3D printed grenades as items that might raise alarm. Slota did not believe "you could ever really use them" because "the guy who made it said you gotta use black powder and I don't want to do that. That's how you blow your fingers off." Slota denied that there were any explosive precursors in the residence. Slota also denied the group intended to threaten anyone or target any government buildings or schools.

[5] Ragnar Benson authored several books on manufacturing explosives and firearms, including *Homemade C-4: A Recipe For Survival*, *Ragnar's Big Book of Homemade Weapons: Building and Keeping Your Arsenal Secure*, and *Ragnar's Homemade Detonators: How to Make 'Em, How to Salvage 'Em, How to Detonate 'Em.*

44. When asked if Slota liked Glock switches, Slota admitted to possessing one but said it did not work. Slota said that "there's no way to 3D print a switch" and that Slota had "never seen anyone successfully do it."

45. Belcher stated that Slota and Erekson were involved in 3D printing. Belcher mentioned that the group had a "side hustle" selling magazine releases, but that the business flopped quickly. Belcher described the 3D printer as communal property.

46. When asked about the silencers found in the house, Belcher said "we haven't had the chance to test them yet" because they did not have the finishing material. Belcher said that when they believed the NFA was overturned, they started "trying to make fun new things we haven't been able to make before," but that they had not finished any items.

47. When asked about the messages on the firearm magazines, Belcher said they "were just words." Belcher said that he had posted on social media alerts that ICE agents were in a particular area but did not recall posting any specific threats. Belcher admitted that the @c_sk9s account belonged to him. When Belcher was asked whether he could understand the concern regarding a post stating that the user would gun down ICE agents, Belcher replied, "Yeah. That's so stupid."

48. When asked about the short-barreled shotgun, Belcher denied that it was unlawful. When asked if they measured the barrel length, Belcher said "we did." Belcher then mentioned that the NFA had been overturned.

49. Erekson said the firearms in "my room" belonged to him. Erekson described himself as "a paranoid person." He explained that the purpose of the stacked cases of water was to be both a ballistic shield and to disrupt attempted thermal imaging as the ambient temperature of water would always be lower than body temperature. He said that he "just wanted to be left alone" and that he "wouldn't do anything unless provoked," which he defined as "attacking me somehow." Erekson said the 3D printed grenade housing were cat toys. He described the den area as Slota and Belcher's area.

**<u>COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS</u>**

50. As set forth above, the subjects of this investigation are making threating statements toward law enforcement and others using electronic means of communication. Moreover, the subjects have 3-D printed items that look, based on my training and experience, like they could be converted into actual hand grenades. Based on my training and experience, I am aware that those involved in acquiring explosives and firearms and making threats using electronic means of communication will have evidence of these crimes located on electronic devices that are in their possession or contrail. Furthermore, the plethora of 3-D printed firearms (an activity involving electronic modalities) is indicative that further evidence related to the seriousness of the threats to law enforcement will be located on the aforementioned electronic devices. Finally, based on my training and experience, I believe these electronic devices will contain evidence of the motives underlying the subjects' acquisition of weapons regulated by the National Firearms Act.

51. Based on my training and experience, I use the following technical terms to convey the following meanings:

i. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

ii. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

iii. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic

files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

iv. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

v. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same

> capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

52. Based on my training, experience, and research, I know that the cell phones for which I am applying for a warrant to search have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

53. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the storage mediums for which I am seeking a search warrant because:

i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such

as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

ii. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

iii. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence

and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

iv. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

v. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

vi. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

vii. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

viii. I know that when an individual uses a computer to 3D print firearms required to be registered under the NFA, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

54. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. The warrant I am requesting would also permit law enforcement to deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

**CONCLUSION**

55. Based on the foregoing, I request that the Court issue the proposed search warrant. Because the SUBJECT DEVICES are in law enforcement custody, I submit that probable cause exists for the execution of this warrant at any time of day or night.

Respectfully submitted,

C. HLuzek

Chris Hluzek
Task Force Officer
Federal Bureau of Investigation

Subscribed electronically and sworn to telephonically, before me, this 17th day of September, 2026.

Herman N. Johnson, Jr. Digitally signed by Herman N. Johnson, Jr. Date: 2026.09.17 16:03:38 -05'00'

Herman N. Johnson, Jr.
United States Magistrate Judge

# ATTACHMENT A-1

## *Property to Be Searched*

The property to be searched is a gray Apple iPhone ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.


NAMACC Mobile Device Submission Form

**Submission Details:**

Case #: 26H021743

Device Description: Apple Iphone Grey

Submission Date/Time: 9/11/2026

Submitting Investigator/Officer: K. Osley

Signature:

**SUBMITTING INDIVIDUAL COMPLETES TOP PORTION ONLY**

Forensic Lab Use O

**Device Details:**

Warrant/Consent:

Device Owner: Tadashi Ryan Erekson

Device Phone #:

Device Make/Model: Clear Case Gray IPHONE/

Device IMEI:

Device Serial #:

**Return Details:**

Date/Time Returned:

Investigator/Officer Signature:

Forensic Examiner Signature:

# ATTACHMENT A-2

***Property to Be Searched***

The property to be searched is a Samsung Galaxy S21 ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



# ATTACHMENT A-3

## *Property to Be Searched*

The property to be searched is a Nokia G100 ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



# ATTACHMENT A-4

***Property to Be Searched***

The property to be searched is a Wiko cell phone ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



# ATTACHMENT A-5

***Property to Be Searched***

The property to be searched is a Motorola M390A cell phone ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



# ATTACHMENT A-6

***Property to Be Searched***

The property to be searched is a Western Digital hard drive ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



**ATTACHMENT A-7**

***Property to Be Searched***

The property to be searched is a USB thumb drive ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



## ATTACHMENT A-8

***Property to Be Searched***

The property to be searched is an HP Laptop (serial number: 5CD3025QVW) ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



## ATTACHMENT A-9

***Property to Be Searched***

The property to be searched is a Seagate Hard Drive ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



## ATTACHMENT A-10

***Property to Be Searched***

The property to be searched is a WD Blue hard drive ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



## ATTACHMENT A-11

***Property to Be Searched***

The property to be searched is an SD Card (serial number: TX008U6TSMM) ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



## ATTACHMENT A-12

***Property to Be Searched***

The property to be searched is a MacBook Air A1465 ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



# ATTACHMENT A-13

***Property to Be Searched***

The property to be searched is a MacBook Pro A1278 ("SUBJECT DEVICE"). The SUBJECT DEVICE is now located at North Alabama Multi-Agency Crime Center in Huntsville, Alabama. A picture of the SUBJECT DEVICE is included below.



# ATTACHMENT B

## *Particular Things to be Seized*

All records, documents, correspondence, information, and other materials described below that constitute evidence of violations of 26 U.S.C. § 5861(d) (Possession of Unregistered National Firearms Act Weapon); 18 U.S.C. § 875(c) (Threatening Communications), as well as conspiracy to commit these offenses (18 U.S.C. § 371) (collectively, the "Subject Offenses"), occurring after December 1, 2025:

1. Records, design files, communications, information, and data relating to the creation, possession, use, or transfer of firearms, explosives, or other materials that are required to be registered in the National Firearms Registration and Transfer Record.

2. Photographs, videos, or other images of weapons that are required to be registered under the National Firearms Act.

3. Records, communications, information, and data relating to unlawful threatening communications.

4. Records, communications, information, and data relating to motives for possessing unregistered National Firearms Act weapons and for making unlawful threatening communications.

5. Communications with conspirators and records, information, or other material concerning their identities.

6. Evidence of who used, owned, or controlled the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as subscriber information, logs, registry entries, records of Internet Protocol addresses used, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chats," instant messages and text messages, photographs, and correspondence.

7. Passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media.

8. Contextual information necessary to understand the evidence described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.